# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THOMAS R. FORBES, and
SUSAN L. BALDWIN,

        Plaintiffs,

     v.                                Case No. 05-C-591

MILWAUKEE COUNTY and
SCOTT WALKER,

        Defendants.

---

## DECISION AND ORDER RE: PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

### I. PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on May 3, 2005, when the plaintiffs, Thomas R. Forbes ("Forbes") and Susan L. Baldwin ("Baldwin"), filed a complaint in the Milwaukee County Circuit Court alleging that their First and Fourteenth Amendment rights were violated, in violation of 42 U.S.C. § 1983. The plaintiffs' complaint also alleges state law claims for breach of contract, promissory estoppel, and equitable estoppel. On June 1, 2005, the defendants, Milwaukee County ("County") and Scott Walker ("Walker"), removed this action to the United States District Court for the Eastern District of Wisconsin on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1441.

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and venue in the Eastern District of Wisconsin is proper pursuant to 28 U.S.C. § 1391. All parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General L.R. 73.1 (E.D. Wis.).

Currently pending before the court are the plaintiffs' motion for partial summary judgment and the defendants' motion for summary judgment both of which are fully briefed and ready for resolution. For the reasons which follow, the plaintiffs' motion for partial summary judgment will be denied, and the defendants' motion for summary judgment on the plaintiffs' federal claims will be granted. Furthermore, the court will decline to exercise supplemental jurisdiction over the plaintiffs' state law claims and will dismiss those claims without prejudice in order to allow the plaintiffs to refile their state law claims in the Milwaukee County Circuit Court.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendants' motion for summary judgment was accompanied by a set of proposed findings of fact. The plaintiffs' response to the defendants' motion for summary judgment contained responses to the defendants' proposed findings of fact. Likewise, the plaintiffs' motion for partial summary judgment was accompanied by a set of proposed findings of fact. And, the defendants' response to the plaintiffs' motion for partial summary judgment contained responses to the plaintiffs' proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are the material and (except where noted) undisputed facts that are relevant to the disposition of the plaintiffs' motion for partial summary judgment and the defendants' motion for summary judgment.

Baldwin commenced employment with Milwaukee County in June of 1969. (Pl.'s Proposed Findings of Fact in Opp. to Def.'s Mot. for Summ. J. (("PPFOF") ¶ 1.) On September 24, 1993, upon the Milwaukee County Executive's submission of request for appointment, recommendation for appointment by the Committee on Parks, Energy, and Environment, and Resolution of the County

2

Board of Supervisors, Baldwin was appointed as the Director of the Department of Parks, Recreation, and Culture. (PPFOF ¶ 2.)

In May of 1996, upon the Milwaukee County Executive's submission of confirmation for reappointment, recommendation for reappointment by the Committee on Parks, Energy, and Environment, and Resolution of the County Board of Supervisors, Baldwin was reappointed as the Director of the Department of Parks, Recreation, and Culture. (PPFOF ¶ 3.)

In May of 2000, upon the County Executive's submission of confirmation for reappointment, a 7-0 vote by the Committee on Parks, Energy, and Environment recommending reappointment, and Resolution of the County Board of Supervisors, Baldwin was reappointed as Director of the Department of Parks, Recreation, and Culture. (PPFOF ¶ 4.)

On June 4, 2002, Milwaukee County Executive Scott Walker issued a memo to Baldwin requesting that she waive benefits and return the memo to him in order to be considered part of his team. (PPFOF ¶ 21.) At the time Baldwin signed the agreement, she made arrangements to take a reduction in pay and signed some waivers about her pension rights as part of her support of the Walker administration. (PPFOF ¶ 22.)

Baldwin was very enthusiastic to work for Milwaukee County and talked to Walker about her willingness to work for Milwaukee County and the things that she had done and had been doing with the department that she felt were good, positive, and her desire to continue working with the County had not changed after that point. (PPFOF ¶ 23.) Walker's June 4, 2002 memo cited section 59.17 of the Wisconsin Statutes as his authority to terminate Baldwin. (PPFOF ¶ 24.)

Walker stated in the June 4, 2002 memo that, "By signing this letter you further agree to cooperate with the County Executive in all terms of fulfilling the vision of serving the citizenry of

3

Milwaukee County. Upon receipt of these signed letters, I will review all of them and make my final determinations in the near future." (PPFOF ¶ 29.) Upon receipt of the June 4, 2002 memo, Jertha Ramos ("Ramos" or "Ramos-Colon"), the Milwaukee County Deputy Director of Human Resources, concluded that her job was in jeopardy if she did not waive her retirement benefits as Walker had requested. (PPFOF ¶ 28.)

Forbes earned a Bachelor of Science degree from the University of Cincinnati, and Forbes started employment with Milwaukee County as the manager of the County's laundry in 1985. (PPFOF ¶¶ 5, 6.)

From 1987 to 1996, Forbes worked in the Milwaukee County Department of Human Services, which was called the Department of Social Services at that time and was the assistant manager of their Operations Department. In that job Forbes was in charge of all the facilities, housekeeping, maintenance, any kind of capital improvements, storeroom, the inactive records, the cafeterias, parking lots, and vehicles. Forbes was hands-on with operational matters as well, giving direction to the various supervisors to carry out functions, contracting out for cafeteria services. In some cases Forbes supervised the workers, and in some cases he supervised the people who supervised the workers. He supervised the individuals who were in charge of the photo I.D. area, and the people who were in the stockroom, for example. (PPFOF ¶ 7.)

In 1996, Forbes was hired as the projects administrator under Baldwin. Forbes had two primary functions: 1) he administratively coordinated capital improvement projects and reported back to the director, making sure they stayed on track, both time-wise and budgetarily; and, 2) he administered leases that the department had with entities such as Bartolotta's Lake Park Bistro, the Betty Brinn Children's Museum, and the Milwaukee Yacht Club. (PPFOF ¶ 8.)

In 2002, Forbes became the acting head of the Facilities Division of the Parks Department. Under him were the local landscape architect functions, park planning functions, park maintenance functions, and landscape services function. Forbes's official title then became "Associate Director." (PPFOF ¶ 12; Defs.' Resp. to PPFOF ¶ 12.)

The Employees' Retirement System of Milwaukee County ("ERS") was created to encourage qualified personnel to enter and remain in the service of Milwaukee County by providing for a system of retirement, disability, and death benefits for its employees. (PPFOF ¶ 30.)

ERS is part of an ongoing administrative scheme containing reasonably ascertainable terms and was for the specific purpose of providing a source of retirement income to employees of the County, including Forbes and Baldwin, upon their retirement or earlier termination of employment, and to their spouses or other beneficiaries upon death. The normal retirement benefit is a monthly pension for the life of the participant. (PPFOF ¶ 31.)

As county employees, Forbes and Baldwin were participants in, and thus subject to the rules of, ERS. Participants in ERS are entitled to receive maximum pension benefits if they retire from active employment at a point on or after the sum of their years of service and their age equals 75 ("the Rule of 75"). (DPFOF ¶ 10.)

On August 19, 2003, Milwaukee County Executive Scott Walker informed Forbes and Baldwin (and the three other members of the Parks Department's senior management team) that he had decided the Parks Department should "go in a different direction" and that they all had to exercise one of the following three choices at that meeting: they could resign, retire, or be terminated. Everyone at the meeting understood that all five "were told [they] were fired" and "all [were] going to be let go that day." (Def.'s Proposed Finding of Fact ("DPFOF") ¶ 4.)

5

Baldwin needed to be employed by Milwaukee County until October 28, 2003 to qualify for her Rule of 75 full pension benefit. (PPFOF ¶ 44.) And, during the meeting on August 19, 2003, Baldwin asked Walker if he would allow her to use her accrued time to get to her retirement date with her full benefit. Walker responded that he would consider it. (PPFOF ¶ 45.) Baldwin also told Walker that Forbes was very close to his full retirement date and asked if Walker would give Forbes permission to take a different lower level Milwaukee County job where he could work until he could reach his Rule of 75 for retirement. Walker responded that he would consider it. (PPFOF ¶ 47.) Baldwin told Walker that if he would honor her terms, Forbes and Baldwin, and the rest of the senior management team, would go away very quietly and not make negative comments to the press. (PPFOF ¶ 48.) At his deposition, Walker testified that the press would have an interest in speaking with Baldwin and/or Forbes about their perspective of what happened. (PPFOF ¶ 49.)

After Walker left the room, Ramos and William Domina ("Domina"), Milwaukee County Corporation Counsel, stayed in the room. Baldwin then stated that, "I can't sign anything until I know I have a deal with the County Executive with the issues that I had raised with him." (PPFOF ¶ 50.) Someone from Walker's office then called Domina and Domina was out in the hall approximately five minutes on the phone. (PPFOF ¶ 51.)

After his telephone call, Domina returned to the room and told Baldwin that Walker had agreed to the deal, that is, that Baldwin would be allowed to use her accrued time to get to the Rule of 75. Domina also told Baldwin that Walker had asked him to convey to Baldwin that she needed to start to take sick time immediately because Walker wanted Baldwin out of there the same day. (PPFOF ¶ 52.) Forbes testified that Baldwin returned to the meeting and stated that the County Executive had agreed to her request to use her time to get to the Rule of 75 and therefore she was

6

choosing the retirement option. (Forbes Dep. at 68.) The defendants dispute this finding of fact and assert that Domina never stated that Walker "had agreed to the deal." Furthermore, the defendants deny that Walker ever agreed to anything other than his statement that he would not oppose the plaintiffs receiving what any county employee was entitled to receive. (Defs.' Resp. to PPFOF ¶ 52.)

Domina then told Ramos that they needed to make sure that Baldwin had enough time to get her to the October 28th date so she could obtain her full retirement benefit. (PPFOF ¶ 58.) The defendants dispute this finding of fact. According to the defendants, Domina simply stated that Baldwin "would need to speak with Human Resources in terms of confirming that [sic] process for retirement and what her rights were relative to exercising time to get whatever date she felt she needed to." (Defs.' Resp. to PPFOF ¶ 58.)

Ramos then used the telephone in Baldwin's office to call Matt Janes ("Janes"), the Milwaukee County Employee Benefits and Retirement Manager. When Ramos terminated the phone call, she came back in and said, "Yes, Ms. Baldwin, you do have enough time to get you to the Rule of 75." (PPFOF ¶ 59.) The defendants dispute this finding of fact to the extent that Ramos told Baldwin that she had an accumulation of time, but did not "talk about the use of time." (Defs.' Resp. to PPFOF ¶ 59.)

Baldwin then stated to Ramos, "What do we need to do to make this happen?" Ramos handed Baldwin the resignation letter and said, "He [Janes] said we should cross out the August 19th date and you should write in October 28, 2003, and then you should initial it." (PPFOF ¶ 60.) The defendants dispute that Janes so instructed Ramos. (Defs.' Resp. to PPFOF ¶ 60.) Baldwin changed the date per Ramos' instructions, initialed it as she was instructed, and asked Ramos to initial the

change. (PPFOF ¶ 61.) The defendants deny that Ramos instructed Baldwin to change the date in question. (Defs.' Resp. to PPFOF ¶ 61.)

Furthermore, at some point during the meeting, Domina called Forbes out into Baldwin's adjoining office and told Forbes that Walker agreed to allow him to apply for any vacancy in the Parks Department, and that Walker would not stand in the way of Forbes getting such a position. (PPFOF ¶ 56.)

At his deposition, Walker testified that he did not consider the termination of the plaintiffs to be for cause or not for cause. (PPFOF ¶ 35.) Walker testified: "All I did specifically [on August 19, 2003] was come in and announce to Baldwin and the others what we were making the decision about, that we were looking for new leadership and that we were offering three different ways to end employment with the County." (PPFOF ¶ 36.) After Walker made the decision to make a change in the leadership, he was willing to consider the advice from corporation counsel and human resources as to how the terminations were going to be carried out. (PPFOF ¶ 38.) Walker testified that the plaintiffs would be treated consistent with the way other employees were treated. (PPFOF ¶ 53.)

On August 21, 2003, Baldwin received a phone call from Chuck McDowell ("McDowell"), the Human Resource Director for Milwaukee County, to let her know that Walker was not going to let Baldwin use sick time to attain her full retirement date, and that instead, they had made a unilateral decision to place Baldwin on unpaid administrative leave, and coupled with her 26 hours of vacation, that would get her to the October 28th date. Baldwin replied that she had over 200 hours of vacation time and holiday time--not 26 hours as McDowell had indicated. McDowell told Baldwin that he would check and call her back. (PPFOF ¶ 93.) The defendants dispute this finding of fact because McDowell testified that during this telephone conversation he did not mention

8

Walker or any decision regarding Baldwin's use of sick leave. (Defs.' Resp. to PPFOF ¶ 93.)

(McDowell Dep. 38-44.)

McDowell's August 21, 2003 phone message to Baldwin was as follows:

> Hi. You've reached the phone of Sue Baldwin. Please leave a message, and I will be happy to give you a call back. Thank you. (Beep.) [] ANSWERING MACHINE: Saved message, Thursday, August 21st, 5:37 p.m.: CALLER MESSAGE: Hello, this is Chuck [McDowell]. Could you give me a call? I am still at the office, 278-4148. Talking with Matt [Janes], yes, you do have that number of hours vacation and holiday. We were using that in terms of getting you to the October 28th date. So that would be included. In addition to the leave without pay, that gets you to the 28th day. But give me a call if you have any questions. We will talk about it. Thanks. Bye.

(PPFOF ¶ 95.)

On August 22, 2003, McDowell informed Dave Umhoefer, a reporter for the *Milwaukee Journal Sentinel*, that Baldwin had been placed on "unpaid leave" status through October 28, 2003 to accomplish the deal. McDowell told the *Milwaukee Journal Sentinel* that he was implementing an agreement reached by Walker, county lawyers, and Baldwin when he set a new departure date for Baldwin. McDowell said he filled the gap with an administrative decision based on the October 28th date given by Walker's office after the firing. McDowell called it "the humane thing" to do. "This was negotiated" as part of Baldwin's departure, McDowell told the press. (PPFOF ¶ 99.) The defendants dispute this finding of fact because McDowell testified that he only discussed "some hypothetical scenarios, of which [he gave] hypothetical answers" with Dave Umhoefer. McDowell further testified that he was misquoted in the article. (Defs.' Resp. to PPFOF ¶ 99.)

Walker testified that he does not remember discussing placement of Baldwin on unpaid leave to get to the Rule of 75. (PPFOF ¶ 119.) Stephen Mokrohisky, Walker's former chief of staff,

9

testified that it was McDowell and Walker who made the joint decision to keep Baldwin's separation date as August 19, 2003, not October 28, 2003. (PPFOF ¶ 102.)

Dennis Weedall ("Weedall"), who was one of the Parks Department managers present at the August 19, 2003 meeting, testified that at some point during the meeting Baldwin stated that the Parks Department managers would "go quietly," that is, that the managers would not speak out to the media and say that they were being unfairly relieved of their duties because the County Executive had agreed to Baldwin's request. (Levy Aff., Ex. J, Weedall Dep. at 51.) Accordingly, Baldwin and Weedall did not say anything negative when speaking to the press (PPFOF ¶ 65.)

The person appointed by Walker to replace Baldwin, was not confirmed by the Milwaukee County Board as of October 28, 2003. (PPFOF ¶ 162.)

On August 19, 2003, Jack Takerian ("Takerian"), the new acting director of parks reporting directly to Walker, told Forbes that Takerian had been instructed to talk to Forbes about a job. Takerian told Forbes that he needed to fill out an application. (PPFOF ¶ 66.) The defendants dispute this finding of fact to the extent that they dispute that Takerian was "instructed" to talk to Forbes. According to the defendants, Walker simply told Forbes that he would not "stand in the way" of Forbes being hired for another lower level Parks Department job. (Defs.' Resp. to PPFOF ¶ 66.)

Forbes received a phone call at approximately 7:30 a.m. on Wednesday, August 20, 2003 from Takerian. Takerian indicated that he had been instructed by Walker to discuss a job with him. Takerian stated that there was a position of a seasonal unit coordinator that was open and offered it to Forbes. Forbes asked Takerian if that was with the approval of Walker, and Takerian replied, "Yes." Forbes then stated, "What process do I go through to get into that position?" Takerian stated that he would have Greg McKinstry ("McKinstry") be in touch with Forbes to talk about how it

would come about. Takerian told Forbes that he could have the job. (PPFOF ¶ 72.)  The defendants

dispute this finding of fact and assert that Forbes rejected the suggestion of a seasonal job because

it would not provide health insurance.  The defendants also assert that Forbes could not be offered

the job without his submitting an application and being interviewed.  (Defs.' Resp. to PPFOF ¶ 72.)

Forbes received a telephone call from McKinstry sometime during midday on August 25,

2003.  McKinstry told Forbes that he would not be receiving consideration for a regular appointment

of Park Unit Coordinator I, only as a seasonal unit coordinator.  Forbes asked McKinstry why, where

that came from?  McKinstry replied, "The County Executive's office." (PPFOF ¶ 85.)  The

defendants dispute this finding of fact because McKinstry testified that he had never received any

direction or instruction from Walker, Walker's staff, or *anyone* regarding the hiring or (or refusal to

hire) Forbes.  (Defs.' Resp. to PPFOF ¶ 85.)

Greg Youngs ("Youngs") had come up through the ranks of the Parks Department and had

been the regional manager and deputy director for decades.  Forbes wanted to learn more about the

unit coordinator position and find out whether Youngs thought the unit coordinator job was a good

fit for Forbes.  Youngs told Forbes that he thought it would be a really good fit for Forbes, and that

he had no doubt that Forbes could handle the job of unit coordinator. (PPFOF ¶ 78.)

McKinstry, the Human Resources Manager of the Parks Department, testified that because

Forbes was previously classified as a regional manager, he could easily be placed on the unit

coordinator list, insomuch as the unit coordinator is a lower position than the regional manager.  The

unit coordinator position reported to the regional manager position. (PPFOF ¶ 79.)

Thereafter, in the summer of 2004, Forbes received a telephone call from the Human

Resources Analyst at the Parks Department, Nancy Gall, asking him to interview for a position as

11

a Parks Unit Coordinator. Forbes never received any communication at all after he left the building that day about whether he had been appointed or anyone else had been appointed until depositions were conducted in this action. At the depositions, Forbes found out that at least two people were appointed or all three positions were filled. (PPFOF ¶ 159.)

Prior to commencement of this legal action, Notices of Claim by Baldwin and Forbes were served by plaintiffs' counsel on the County Clerk and McDowell in order to, "notify the County of [the plaintiffs'] legal claims, exhaust any administrative remedies, and redress the injuries inflicted on [the plaintiffs] by the County when it breached its fiduciary duties to [them] and interfered with the exercise of [their] benefits pursuant to the Employees' Retirement System of the County of Milwaukee," breached its contractual duties, violated constitutional rights and interfered with attainment of retirement benefits. The plaintiffs demanded that, "the County take all measures necessary to restore [the plaintiffs'] status so that [they are] qualified to receive full benefits under the terms of the Retirement System[.]" (PPFOF ¶ 167.) McDowell did not respond to the plaintiffs' Notices of Claim nor did anyone else respond on behalf of the defendants. (PPFOF ¶ 168.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ.

P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th

13

Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252). Because the parties in this case have filed cross motions for summary judgment, the court must extend the required favorable inferences to each when considering the other's motion. *See McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683, 687 (7th Cir. 1991).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

*A. First Amendment Claim*

The plaintiffs allege that Walker deprived them of their First Amendment rights to speak on issues of public concern in violation of 42 U.S.C. § 1983. Specifically, the plaintiffs assert that in exchange for the plaintiffs' silence, that is, their not making any statements to the press regarding the County Executive's decision to "let go" the senior management team of the Milwaukee County Parks Department, Walker agreed to the following: (1) allow Baldwin to use her accrued time to get to the retirement date on which she would receive her full retirement benefit, and (2) allow Forbes to apply for a lower level Parks Department position so that Forbes could be re-employed by the Parks Department until such a time as he could retire with his full retirement benefit. The plaintiffs further assert that because Walker did not uphold his part of the bargain, and the plaintiffs did, that is, the plaintiffs did not make any statements to the press, Walker violated the plaintiffs' First Amendment rights. In response, the defendants assert that, even assuming the parties did enter into the

14

aforementioned contract, and further assuming that Walker failed to uphold his end of the bargain, it does not follow that the plaintiffs' First Amendment rights were violated. According to the defendants, the plaintiffs have simply alleged breach of contract and promissory/equitable estoppel claims, not a violation of the First Amendment. (Defs.' Reply Br. at 3.)

To be sure, the plaintiffs' First Amendment claim is not the typical First Amendment claim. The plaintiffs are not alleging that their right to speak freely is being violated by a particular statute, ordinance, or regulation. Nor are they alleging that they spoke out on issues of public concern and were retaliated against because of such speech. Rather, they are alleging that they agreed to be "silenced" on a matter of public concern in exchange for a certain benefit, and because they did not obtain the bargained for benefits, their First Amendment rights were violated. Fundamentally, then, the plaintiffs' First Amendment claim is a contract claim.

In *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), the Supreme Court addressed the interrelationship between contract law or quasi-contract law, promissory estoppel, and the First Amendment. In *Cohen*, the plaintiff, a political operative, offered, on the condition of confidentiality, to provide two newspapers damaging information regarding one of the rival party's political candidates. *Id.* at 665. The newspaper, however, broke its promise of confidentiality and published Cohen's name as the source of the damaging information. *Id.* at 666. Upon seeing Cohen's name as the source, he was fired, and thereafter, Cohen sued the newspaper for fraudulent misrepresentation and breach of contract. *Id.* The Minnesota Supreme Court rejected those claims, but held that if Cohen could recover at all, it would be on the theory of promissory estoppel. However, the court held that the enforcement of the newspaper's promise of confidentiality would violate the newspaper's First Amendment rights. *Id.* at 667. The U.S. Supreme Court reversed,

holding that the First Amendment did not prohibit Cohen from recovering the damages he suffered as a result of the newspaper's broken promise, regardless of the incidental effect of enforcing the promise on the First Amendment rights of the newspapers. *Id.* at 670-71. In rejecting the defendants' argument that enforcing their promise would "punish" them for publishing truthful information, the Court stated that it was the parties themselves who determined "the scope of their legal obligations," and thus, "any restrictions that may [have been] placed on the publication of truthful information [were] self-imposed." *Id.* at 671.

Similar reasoning applies here. In this case, again, assuming the parties entered into the aforementioned contract, the parties bargained for the plaintiffs' silence on a matter of public concern. More precisely, the plaintiffs contractually waived their First Amendment rights to speak on certain issues of public concern, and thus, any restrictions that may have been placed on their speech were self-imposed. Furthermore, it is well-established that the inclusion of a waiver of a constitutional right does not render a contract *per se* unenforceable. *Lake James Cmty. Volunteer Fire Dep't v. Burke County*, 149 F.3d 277, 280 (4th Cir. 1998) (citing *Town of Newton v. Rumery*, 480 U.S. 386, 397 (1987)). Indeed,

> [c]onstitutional rights, like rights and privileges of lesser importance, may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where the parties to the contract have bargaining equality and have negotiated the terms of the contract, and . . . ha[ve] engaged in other contract negotiations.

*Henley v. Cuyahoga County Bd. of Mental Retardation and Developmental Disabilities*, 2005 WL 1579781, *7 (6th Cir. 2005) (internal quotations and citations omitted); *see also Lake James*, 149 F.3d at 280 (stating that "a contractual waiver of a constitutional rights must be a knowing waiver,

16

must be voluntarily given, and must not undermine the relevant public interest in order to be enforceable").

Turning to the facts of this case, a review of the record clearly reveals that the plaintiffs voluntarily relinquished their First Amendment rights to speak to the press regarding their departure from the Milwaukee County Parks Department. Indeed, it was the plaintiffs who suggested that they relinquish their First Amendment rights in exchange for Walker's "help" in obtaining their full retirement benefits. And, given that it was the plaintiffs who suggested the "silence" term of the contract, I am satisfied that they understood the consequences of waiving their First Amendment rights to speak publicly regarding their departure from the Parks Department.

Nor can I say that the contract undermines the relevant public interest. Undoubtedly, it is in the public's interest to receive speech on issues of public concern. Nevertheless, just as the right to receive speech is contingent upon the existence of a willing speaker, speech which may be deemed to be in the "public's interest" also presupposes a willing speaker. *Virginia State Bd. of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748, 756 (1976). And, here it is clear that the plaintiffs voluntarily chose not to be willing speakers. Furthermore, the plaintiffs' legitimate interests in attaining their full retirement benefits as they left the employ of the County Parks Department and the specific right waived by the plaintiffs (their agreeing not to make what would presumably be disparaging remarks to the press about Walker or about their "being let go" from the Parks Department only) are closely related, as they arise from the same set of circumstances. *Henley*, 2005 WL 1579781 at *8. Thus, the plaintiffs' waiver of their First Amendment rights was narrowly tailored, that is, the plaintiffs did not waive their rights to speak on any other issues of public concern. Moreover, the agreement was only binding on the Parks Managers who agreed to its terms,

17

thus leaving other members of the public, or other Parks Department employees, free to voice their concerns about the departure of the Parks Department's senior management team. In sum, assuming the parties did enter into the aforementioned contract, such contract is not by its terms unconstitutional. Thus, the contract is enforceable.

Accordingly, any restrictions that may have been placed on the plaintiffs' speaking to the press were self-imposed. It was not Walker's breach of their agreement that violated or deprived the plaintiffs of their First Amendment rights to speak on issues of public concern, but rather, their own contractual waiver of their First Amendment rights that did so. After contractually waiving their First Amendment rights, plaintiffs cannot now argue that it was Walker's breach of their agreement which "silenced" them, rather than their own knowing and voluntary waiver. Consequently, and for all of the foregoing reasons, the plaintiffs' claim that their First Amendment rights were violated cannot survive summary judgment.

*B. Due Process Claims*: *Deprivation of Liberty Interest*

The plaintiffs' complaint also sets forth both a substantive due process and a procedural due process claim pursuant to section 1983. (Compl. ¶¶ 52, 54.) In so doing, however, the plaintiffs do not specifically identify what liberty and/or property interest is alleged to have been violated for each claim. (Compl. ¶¶ 52, 54.) Be that as it may, it is clear from the allegations set forth in the plaintiffs' complaint that they are alleging that their occupational liberty interests were deprived without due process of law. It is less clear, however, whether the plaintiffs are alleging a substantive due process liberty interest claim, and if so, what liberty interest it is that they allege has been arbitrarily violated by the state.

18

Indeed, the only "liberty interests" that the plaintiffs have alleged with particularity are their occupational liberty interests. And, to the extent the plaintiffs are alleging that their occupational liberty interests were violated under substantive due process, their claim must fail. This is because "[o]ccupational liberty . . . is not protected by substantive due process." *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994) (citing *Illinois Psychological Ass'n. v. Falk*, 818 F.2d 1337, 1343-44 (7th Cir. 1987)). Indeed, "any cause of action for the deprivation of occupational liberty [must] be confined to a claim under procedural due process [because] there is no such cause of action under substantive due process." *Zorzi*, 30 F.3d at 895; *see also Gyrion v. City of Chicago*, 2006 WL 1302414, *2 n.8 (N.D. Ill. 2006) ("The occupational liberty interest is procedural rather than substantive, so the government may impinge upon the interest as long as it first affords the affected employee notice and an opportunity to be heard.")

The only other "liberty interest" the plaintiffs make reference to in their brief is plaintiff Baldwin's "right to speak where her good name, reputation, honor and integrity were at stake." (Pl.'s Resp. Br. at 25.) This argument, however, is essentially a restatement of Baldwin's First Amendment claim under the guise of a substantive due process claim, and "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing the[] claim[].'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Accordingly, to the extent the plaintiffs are arguing that their substantive due process liberty interests were violated, their claim must fail. Such being the case, the court will only address the plaintiffs' procedural due process claim that they were denied their occupational liberty interests without due process of law.

19

"'In procedural due process claims, the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.'" *Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir. 1990) (emphasis omitted) (internal quotations omitted) (quoting *Zinermon v. Burch*, 494 U.S. 113 (1990)). Accordingly, procedural due process claims require a two-step analysis. At the outset, the court must determine whether the plaintiff was deprived of a constitutionally protected interest in life, liberty, or property. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). And, if so, the court must then consider what process was due. *Id.*

In their complaint, the plaintiffs allege that their liberty interests guaranteed by the Fourteenth Amendment were violated because "Walker's false accusations . . . were so damaging as to make it difficult or impossible for Forbes and Baldwin to escape the stigma of his statements." (Compl. at ¶ 45.) Specifically, the plaintiffs allege that Walker's false statements to the press regarding their management of the Parks Department damaged their good names and their reputation in the community. (Compl. at ¶¶ 44, 46.) The plaintiffs, however, have not identified *any* statement made by Walker regarding plaintiff Forbes. Nor has the court, after examining the record, been able to find one. Furthermore, the plaintiffs' arguments regarding the violation of the plaintiffs' liberty interests focus solely on Walker's statements regarding Baldwin. (Pl.'s Resp. Br. at 25-26.) Such being the case, the court will not address the claim that plaintiff Forbes's liberty interest was violated because of Walker's allegedly false statements to the press.

Simply stated, the first question before the court is whether Walker's allegedly false statements to the press gave rise to such stigmatic and reputational harm so as to implicate a constitutionally cognizable liberty interest. Walker allegedly made two false statements to the press.

20

First, Walker made a statement that Baldwin did not notify him in a timely manner regarding the Parks Department's projected $2 million budget deficit. (Levy Aff., Ex. U; Ex. V.) And second, Walker made a statement that he had wanted other options looked at rather than closing some swimming pools early, and that he accepted Baldwin's recommendation to close the pools early because "there were no alternatives given." (Levy Aff., Ex. V.) Baldwin alleges that these statements are false. Baldwin asserts that she did alert Walker to the projected $2 million deficit in a timely matter, and that she did ask Walker if he wanted other options explored. Baldwin further asserts that these false statements caused her such stigmatic and reputational harm so as to deprive her of her constitutionally protected liberty interest in pursuing the occupation of her choice.

An injury to Baldwin's reputation by itself is not a "liberty" interest protected under the Fourteenth Amendment. *Paul v. Davis*, 424 U.S. 693, 708-09 (1976). And, although an occupational liberty interest has been recognized, such a liberty interest is not infringed unless the employer's statement "impugns the employee's moral character or implies dishonesty or other job-related moral turpitude." *Hedrich v. Bd. of Regents of Univ. of Wis. System*, 274 F.3d 1174, 1184 (7th Cir. 2001) (internal quotations and citations omitted); *see also Omosegbon v. Wells*, 335 F.3d 668, 675 (7th Cir. 2003) ("A denial of tenure or employment is only stigmatizing if it is accompanied by a publicly announced reason that impugns the employee's moral character or implies dishonesty or job-related moral turpitude.") (internal quotations omitted). As the Seventh Circuit has stated,

> [i]f the character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities, the employee can bring suit based on the deprivation of his freedom to pursue the occupation of his choice, a liberty interest protected by the due process clause of the Fourteenth Amendment. [However,] [i]t is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing

actions *make it virtually impossible for the employee to find new employment in his chosen field*.

*Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 531 (7th Cir. 2000) (citations and internal quotations omitted) (emphasis added); *see also Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir. 1992) (stating that "[l]iberty is not infringed when the individual is only somewhat less attractive to some other employers, as through a label of incompetence or poor management skills, [instead,] there must be permanent exclusion from or protracted interruption of employment") (internal quotations and citations omitted).

Here, even assuming that Walker's statements were false, his statements did not impugn Baldwin's moral character. Nor did Walker's statements imply that Baldwin had acted dishonestly or with moral turpitude when she served as the director of the Milwaukee County Parks Department. *Omosegbon*, 335 F.3d at 675. Furthermore, Baldwin has not presented *any* evidence to establish that as a result of Walker's statements it was "virtually impossible for [her] to find new employment in [her] chosen field." *Bordelon*, 233 F.3d at 531. Thus, Baldwin has not established that Walker's statements deprived her of a constitutionally protected liberty interest. Consequently, and for all of the foregoing reasons, Baldwin's claim that she was deprived of a liberty interest without due process of law cannot survive summary judgment.

22

*C. Due Process Claims Under Section 1983: Property Interest*[1]

Baldwin asserts that she had a constitutionally protected property interest in her position as director of the parks department pursuant to Wisconsin Statute § 59.17(2)(bm)2., and that she was denied such property interest without due process of law. According to Baldwin, pursuant to § 59.17(2)(bm)2., she was entitled to hold her position as director of the Milwaukee County Parks Department until the county executive made a new appointment to the directorship and the newly appointed director was confirmed by the Milwaukee County Board. Thus, Baldwin argues that her removal prior to the confirmation of her replacement, and without notice and hearing, violated her right to procedural due process.

To reiterate, "'[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law.'" *Doe by Nelson*, 903 F.2d 499, 502 (7th Cir. 1990) (emphasis omitted) (internal quotations omitted) (quoting *Zinermon v. Burch*, 494 U.S. 113 (1990)). Accordingly, procedural due process claims require a

---

[1] To reiterate, the plaintiffs' complaint sets forth both a substantive due process and a procedural due process claim pursuant to section 1983. In so doing, however, the plaintiffs do not specifically identify what liberty and/or property interest is alleged to have been violated for each claim. It is clear from the allegations set forth in the plaintiffs' complaint that they are alleging that their property interests were deprived without due process of law. It is less clear whether the plaintiffs are alleging a substantive due process property interest claim. To the extent the plaintiffs are alleging a substantive due process property interest claim, however, their claim must fail. This is because the scope of substantive due process is very limited, and protects plaintiffs only against arbitrary government action that "shocks the conscience." *Tun v. Whitticker*, 398 F.3d 899, 902 (7th Cir. 2005) (internal citation and quotation omitted). And, nothing about the defendants' actions here shocks the conscience. Furthermore, in cases "where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that available state remedies are inadequate, the plaintiff has not stated a substantive due process claim." *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997) (internal quotations omitted). Such being the case, the plaintiffs have not stated a substantive due process property interest claim.

23

two-step analysis. At the outset, the court must determine whether the plaintiff was deprived of a constitutionally protected interest in life, liberty, or property. *Logan*, 455 U.S. at 428. And, if so, the court must then consider what process was due. *Id.* Thus, the first question before the court is whether Baldwin's appointment pursuant to section 59.17(2)(bm) gave rise to a constitutionally cognizable property interest.

To be constitutionally cognizable, a property interest must involve something to which a person has a "legitimate claim of entitlement." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A unilateral expectation will not suffice. *Id.* Furthermore, a protected property interest must be based on a source independent of the Constitution, for instance, state law or a contract with the state. *Id.* In the employment context, the Seventh Circuit has "generally required that a plaintiff be able to show that the terms of her employment provide for termination only 'for cause,' or otherwise evince 'mutually explicit understandings' of continued employment." *Omosegbon*, 335 F.3d at 674 (citations omitted). "[T]he existence of a property interest in public employment cognizable under the due process clause depends on whether state law has affirmatively created an expectation that a particular employment relationship will continue unless certain defined events occur." *Burrell v. City of Mattoon*, 378 F.3d 642, 467 (7th Cir. 2004) (internal quotations omitted). And, as the Seventh Circuit has stated, "a term contract . . . creates a property interest." *Batagiannis v. West Lafayette Cmty. School Corp.*, 454 F.3d 738, 740 (7th Cir. 2006) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) and *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).

Given the foregoing legal standards, if section 59.17(2)(bm)2. provides that the director of the Milwaukee County Parks Department shall hold his or her appointment until a replacement director is confirmed by the Milwaukee County Board, then Baldwin has established a protected

property interest in continued employment until the confirmation of her replacement. On the other hand, if section 59.17(2)(bm)2. does not provide Baldwin with a "term" of employment, then she has not established a protected property interest. *See Mitchell v. Glover*, 996 F.2d 164, 167 (7th Cir. 1993) (stating that an "at-will employee has no entitlement to continued employment, and thus, an at-will employee has no constitutionally protected property interest in his position").

Section 59.17(2), entitled "County Executive: Duties and Powers," provides in relevant part:

(b) In any county with a population of 500,000 or more, appoint and supervise the heads of all departments except where the statutes provide that the appointment shall be made by a board or commission or by other elected officers. . . . Any department head appointed by a county executive under this subsection may be removed at the pleasure of the county executive.

(bm) 1. In any county with a population of 500,000 or more, appoint the following persons:

a. The director of parks, recreation and culture under s. 27.03(2).

 . . .

2. Each appointment under subd. 1. is subject to the confirmation of the county board and is in the unclassified service, serving at the pleasure of the county executive and holding office until a new appointment is made by the county executive and confirmed by the board. No prior appointee may serve longer than 6 months after the term for which he or she was appointed and confirmed expires, unless reappointed and reconfirmed. The term of each appointment is 4 years or less.

Wis. Stat. § 59.17(2).

Baldwin argues that pursuant to the plain language of subsection 59.17(2)(bm)2., she "was to continue holding office until a new appointment was made by Walker and then confirmed by the [Milwaukee County] Board." (Pl.'s Br. in Supp. of Mot. for Partial Summ. J. at 3.) In response, the defendants argue that the plaintiffs' interpretation of § 59.17(2)(bm)2. would lead to an absurd result.

Specifically, the defendants argue that the plaintiffs' interpretation of the statute would "rob the elected county executive of his right to control his own appointees." (Defs.' Resp. Br. at 9.)

As a federal court interpreting a state statute, this court is required to apply the law as declared by the state's highest court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The Wisconsin Supreme Court, however, has never interpreted or applied section 59.17(2) and thus has never answered whether section 59.17(2) creates a protected property interest in continued employment. In the absence of authority directly on point, this court must determine the issue of state law as it believes the Wisconsin Supreme Court would. *Liberty Mut. Fire Ins. Co. v. Statewide Ins. Co.*, 352 F.3d 1098, 1100 (7th Cir. 2003). Typically, if there are state appellate court decisions addressing the issue, the federal court gives those decisions great weight. In this case, however, no state appellate court decisions addressing the issue have been found by the court or by the parties. Indeed, this court has not found *any* Wisconsin case applying this particular section. Nor has either party cited to any Wisconsin case interpreting and applying section 59.17(2) or subsection 59.17(2)(bm)2..

The Seventh Circuit has noted,

a federal court . . . must proceed with caution in making pronouncements about state law. . . . [This is because] what we say lacks any precedential force for state courts. *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388, 1395 (7th Cir. 1992). While it is controlling upon federal district courts until gainsaid by a higher state court, nonetheless, as Judge Ripple of this Circuit has remarked, "it is rarely possible, given the difficulty in making ' Erie Guesses,' to provide, in any principled fashion, a great deal of meaningful guidance for the resolution of future cases. Moreover, federal court pronouncements on the content of state law inherently involve a significant intrusion on the prerogative of the state courts to control that development." *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1416 (7th Cir. 1994) (Ripple, J., dissenting on other grounds). Such pronouncements risk "interrupt[ing] . . . the orderly development and authoritative exposition of state law . . . by sporadic federal court adjudications." *Factors, Etc., Inc. v. Pro Arts Inc.*, 652 F.2d 278, 282 (2d Cir. 1981). If our predictions are erroneous, then, as Judge Sloviter has said: [U]ntil corrected by the

26

state supreme court, [they] inevitably skew the decisions of [those] who rely on them and inequitably affect the losing federal litigant who cannot appeal the decision to the state's supreme court; they may even mislead lower state courts that may be inclined to accept federal predictions as applicable precedent.

*Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1092-93 (7th Cir. 1999).

With the foregoing in mind, this court must best estimate how the Wisconsin Supreme Court would interpret subsection 59.17(2)(bm)2..  The Wisconsin Supreme Court has stated that:

> The ultimate goal of statutory interpretation is to ascertain the intent of the legislature. The first step of this process is to look at the language of the statute. If the plain meaning of the statute is clear, a court need not look to rules of statutory construction or other extrinsic aids. Instead, a court should simply apply the clear meaning of the statute to the facts before it. If, however, the statute is ambiguous, this court must look beyond the statute's language and examine the scope, history, context, subject matter, and purpose of the statute.

*State v. Sweat*, 208 Wis. 2d 409, 415, 561 N.W.2d 695, 697 (1997).  Thus, the first step is to determine whether section 59.17(2)(bm)2. is ambiguous. "[A] statutory provision is ambiguous if reasonable minds could differ as to its meaning.  Ambiguity can be found in the words of the statutory provision itself, or by the words of the provision as they interact with and relate to other provisions in the statute and to other statutes." *Id.* at 416; 561 N.W.2d at 697 (internal quotations and citations omitted).

The language of § 59.17(2)(bm)2., stating that the county executive's appointed department heads "serv[e] at the pleasure of the county executive," connotes "at-will employment." *Campbell v. City of Champaign*, 940 F.2d 1111, 1112 (7th Cir. 1991).  By contrast, the very next phrase, stating that the appointed department heads will  "hold[] office until a new appointment is made by the county executive and confirmed by the board," could be read to connote an employment relationship that will continue until a new appointee is confirmed by the Milwaukee County Board.  Such being the case, reasonable minds could differ as to the meaning of section 59.17(2)(bm)2..  Stated another

27

way, given that the language of subsection 59.17(2)(bm)2. appears to be internally contradictory, and given that the language of subsection 59.17(2)(bm)2. appears to contradict subsection 59.17(2)(b), I am satisfied that section 59.17(2)(bm)2. is ambiguous.

Because the court has found the language of section 59.17(2)(bm)2. to be ambiguous, the court must look beyond the statute's language and examine the scope, history, context, subject matter, and purpose of the statute. The subject matter of section 59.17(2) concerns the powers and duties of the county executives of the counties of Wisconsin. The purpose of section 59.17(2) is to set forth with some degree of particularity the duties and powers of the county executive. Furthermore, with respect to the "context" of subsection 59.17(2)(bm)2., immediately preceding subsection (bm) is subsection (b). And, the subject matter of subsection (b) concerns the power of the county executive to appoint the heads of all the county departments, except where the statutes provide that these appointments are to be made by a board or other elected officers, and to remove, at the county executive's pleasure, any department head who was appointed by the same. Thus, the purpose of subsection (b) is to provide the county executive with the power (unless prohibited by statute) to appoint, supervise, and remove at his or her pleasure the heads of the county's departments; that is, to allow the county executive to appoint the members of his or her "cabinet," to supervise the leadership of the county's departments and, if he or she sees fit, to change the leadership of the county's departments. As previously stated, this latter provision could be read to conflict with the provision of subsection (bm)2. which states that the department head will both serve at the pleasure of the county executive and hold office until a new appointment is made by the county executive and confirmed by the board.

28

Apparently conflicting provisions of law should be construed so as to harmonize them and thus give effect to the leading idea behind the statute. *Sweat*, 208 Wis. 2d 409 at 422, N.W.2d at 700 (citing *State v. Schaller*, 70 Wis. 2d 107, 110, 233 N.W.2d 416 (1975)). And, if a statute is capable of being construed in different ways, that construction which works absurd or unreasonable results should be avoided. *Id.*, N.W.2d at 700. Simply stated, I am persuaded that it would be absurd and unreasonable to construe subsection 59.17(2) in such a way that the county executive is granted the power to appoint the county department heads, that is, the members of the county executive's "cabinet," in subsection (b), yet denied the power to remove such appointees prior to the appointment and confirmation of a replacement in subsection (bm)2.. To so find would lead to an absurd and unreasonable situation in which the county executive, having lost faith in an appointee's ability to lead his or her county department, would not be able to remove that appointee (or at least stop paying that appointee's salary) until such a time as the county executive could appoint and the County Board confirm a new appointee.

The natural reading of subsection 59.17(2)(bm)2. in harmony with subsection 59.17(2)(b) is that the county executive's appointees serve at the pleasure of the county executive, may be removed at the pleasure of the county executive, and may hold office until a new appointment is made by the county executive and confirmed by the County Board up to a maximum of six (6) months after the term for which he or she was appointed and confirmed has expired. In my opinion, this interpretation is consistent with the overall purpose of section 59.17(2). Consequently, and for all of the foregoing reasons, this court believes that the Wisconsin Supreme Court would find that subsection 59.17(2)(bm)2. provides that department heads appointed by the county executive serve at the pleasure of the county executive. As a result, it logically follows that Baldwin did not have a

Case 2:05-cv-00591-WEC   Filed 01/04/07   Page 29 of 35   Document 73

protected property interest in continued employment. Thus, her claim that she was denied her constitutionally protected property interest in continued employment without due process of law cannot survive summary judgment.

Baldwin also argues that she had a protected property interest in her pension, which was denied without due process of law. In support of her argument, Baldwin asserts that a Milwaukee County classified employee has a protected property interest in a pension when the employee has earned ten years of creditable service. Baldwin further argues that, according to Milwaukee County ordinances, an employee with a "vested" pension cannot be denied his or her pension unless the employee has been terminated for "fault or delinquency." (Pl.'s Br. in Support of Mot. for Partial Summ. J. at 9.) Baldwin, however, was not a classified employee. Nor was Baldwin completely denied her pension benefits.

Rather, Baldwin's argument is that, based upon her alleged contract with the county executive, she was entitled to a larger pension benefit than the one she received. Furthermore, Baldwin's alleged contract with the county executive is the only "rule or understanding" to which Baldwin points to support her "entitlement" to such a benefit. Similarly, Forbes appears to argue that he had a protected property interest in the county executive's promise that he would not stand in the way of Forbes' applying for a lower level Parks Department job so he could be re-employed until such a time as he could retire with his full retirement benefit. In support of this "entitlement," Forbes also points to the alleged contract with the county executive.

The Seventh Circuit has held that "[i]f a contract creates rights specific enough to be enforced in state court by awards of damages or specific performance, then it creates a legitimate claim of entitlement; and if it creates such a claim, it is 'property.'" *Mid-American Waste Sys., Inc. v. City of*

30

*Gary, Indiana*, 49 F.3d 286, 290 (7th Cir. 1995) (distinguishing the Seventh Circuit's approach from other circuits' approaches where "only contracts creating a special status (employment, for example) count as 'property'"). Under this formulation, Baldwin has a property interest in receiving her larger pension benefit and Forbes has a property interest in his being permitted to apply for a lower level Parks Department job (and thus, in receiving his larger pension benefit) if they are successful in demonstrating that the County breached their contract. This court, however, does not find it necessary to further examine this issue because, even assuming that the plaintiffs have property interests in their alleged contract with Walker, they have not been denied due process.

This is because the Seventh Circuit has held that "when the issue is the meaning of a commercial contract, a [predeprivation] hearing is *unnecessary*, and the opportunity to litigate in state court is all the process 'due' to determine whether the state has kept its promise."[2] *Mid-American Waste Sys., Inc.*, 49 F.3d at 291 (emphasis in original); *see also id.* (stating that the "opportunity to litigate in [state court] is all the process 'due' for ordinary claims of breach of contract"). In *Mid-American Waste Systems*, the Seventh Circuit held that in a breach of contract action under a lease between a waste hauler and a city, a prior hearing was unnecessary and an adjudication in state court satisfied the requirements of procedural due process. The Seventh Circuit noted "[t]he adequacy of litigation as a means to determine the meaning of a contract is a premise

---

[2] A commercial contract is typically between two sophisticated business entities. Here, the alleged contract is not between business entities, and in that sense, the alleged contract is not the typical "commercial" contract. Nevertheless, the alleged contract is more analogous to a commercial contract than to an employment contract. This is because the terms of the alleged contract do not set forth the terms and conditions of employment. Rather, the plaintiffs' interests in the alleged contract are strictly monetary. And, as the Seventh Circuit has made clear, where the interest "is monetary . . . [and] no one is at risk of starvation if the action precedes the hearing, [state court relief is all the process that is due]. Governments often take property and settle up years later; so, too, with breach of contract." *Mid-American Waste Sys., Inc.*, 49 F.3d at 292.

31

in our legal system," and held that "litigation after the fact provides an ample opportunity to test the validity of the City's interpretation and supply a remedy if the City has erred." *Id.* at 291-92.

Similarly, in this case, the plaintiffs' ability to litigate their breach of contract or promissory/equitable estoppel claims (even though it is after the County's alleged "deprivation" of the plaintiffs' property) "provides an ample opportunity to test the validity of the [County's] interpretation [of the contract or "promise"] and supply a remedy if the [County] has erred [in its interpretation of the contract or not kept its promise]." *Id.*; *see also Garcia v. Kankakee County Housing Authority*, 279 F.3d 532, 535 (7th Cir. 2002) (stating that "a unit of state or local government does not violate the federal Constitution just because it violates a state or local law, including the law of contracts"). Accordingly, because the County was not required to provide a predeprivation hearing, and all the process that is *due* in this case is the plaintiffs' opportunity to litigate their breach of contract or promissory/equitable estoppel claims in state court, the plaintiffs were not deprived of their constitutional rights to procedural due process.

*D. State Law Claims*

In light of the dismissal of all of the plaintiffs' federal claims, the final issue before the court is whether this court should maintain supplemental jurisdiction over the plaintiffs' remaining state law breach of contract, promissory estoppel, and equitable estoppel claims. Case law in the Seventh Circuit establishes a "presumption" against district courts retaining jurisdiction over supplemental state law claims after the federal claims (and concomitant federal interest) have disappeared from a case.

In *Groce v. Eli Lilly & Co.*, 193 F.3d 496 (7th Cir. 1999), the Seventh Circuit "emphasize[d] that it is the well-established law of this circuit that the usual practice is to dismiss without prejudice

state supplemental claims whenever all federal claims have been dismissed prior to trial." *Id.* at 501; *see also Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir. 1996), *vacated on other grounds* 522 U.S. 3 (1997) (reminding district courts that there is a presumption against retaining jurisdiction of supplemental state law claims when the federal claims are dismissed before trial and a concomitant need to state the ground on which the court believes the presumption has been rebutted). This presumption against retaining jurisdiction of supplemental state law claims is "rooted in well-established principles, including the need to afford litigants who actually have cases in which there is a federal interest as expeditious a form of justice as is reasonably possible, and a substantial comity interest in allowing state courts to apply and to interpret their own laws, at least in cases where there is no federal interest at stake." *Williams Elecs. Games, Inc. v. Garrity*, 2005 WL 2284280 at *1 (N.D. Ill. 2005); *see also Kennedy v. Schoenberg Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998) ("'[R]espect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become [a] paramount concern.'") (quoting *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989)).

This presumption, however, is just that, a presumption not a rule, and as the Supreme Court in *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) stated, a district court, in considering the factors set forth in § 1367(c), "'should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). In light of the fact that there is no federal question or interest remaining in this case, and after careful consideration of the factors outlined in *City of Chicago*, this court determines that this case most sensibly should proceed in state court.

33

Indeed, it appears that specific Milwaukee County ordinances, and/or the County's internal procedures regarding the application of its Employee Retirement System will most likely need to be examined in order to decide the plaintiffs' breach of contract or promissory/equitable estoppel claims. Such being the case, the court finds that comity, that is, the interest in allowing state courts to apply and to interpret the state's own laws (or the County's own ordinances), weighs heavily in favor of this court's declining supplemental jurisdiction. Accordingly, this court will decline to exercise supplemental jurisdiction over the plaintiffs' state law breach of contract and promissory/equitable estoppel claims and will dismiss the plaintiffs' state law claims without prejudice so that the plaintiffs may refile these claims in state court.[3]

## IV.  CONCLUSION AND ORDER

In conclusion, and for all of the foregoing reasons, the defendants' motion for summary judgment on the plaintiffs' section 1983 claims will be granted, and the plaintiffs' motion for partial summary judgment on plaintiff Baldwin's procedural due process claim will be denied. Furthermore, the plaintiffs' remaining state law breach of contract, promissory estoppel, and equitable estoppel claims will be dismissed without prejudice so that the plaintiffs may refile these claims in the Milwaukee County Circuit Court.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion for summary judgment on the plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 be and hereby is **GRANTED**;

---

[3]    The court notes that, pursuant to 28 U.S.C. § 1367(d), "[t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as [] the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

**IT IS FURTHER ORDERED** that the plaintiffs' motion for partial summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 be and hereby are **DISMISSED**;

**IT IS FURTHER ORDERED** that the plaintiffs' state law breach of contract, equitable estoppel, and promissory estoppel claims be and hereby are **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

**SO ORDERED** this 4th day of January 2007, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge